May it please the Court, Michael Gallis, Pro Bono Counsel on behalf of Appellant Buddy Kamakeeaina. I'd like to reserve two minutes for rebuttal. Mr. Kamakeeaina has a documented history of PTSD, bipolar disorder, and other serious mental health illnesses. In 2010, he committed his third suicide attempt, after which he was arrested and placed into the Oahu Community Corrections Center, or the Oahu Center, where he remained for 350 days. Is this the one where he was threatening to jump? That is correct. Police thought that this was less of a suicide attempt and more of an attempt to avoid arrest. Well, I think there are a couple things. First, the record shows that Mr. Kamakeeaina attempted suicide. The record in the light most favorable to Mr. Kamakeeaina shows that he attempted suicide before the police even arrived, and that they were aware of that, that his girlfriend reported that he had tried to cut himself with a knife. So the facts in the light most favorable show that Mr. Kamakeeaina may have attempted suicide, and she may have gotten in the way and tried to stop him. They were aware of that. But in any event, that was a suicide attempt, and Mr. Kamakeeaina eventually ended up at the Oahu Center for 352 days, where he reported that that was not the only suicide attempt. You skipped over something. He spent two and a half days in detention in a city facility, right? That's correct. He was at the Central Receiving Division. And these were the officers that talked him off the ledge and encouraged him and got him to surrender and then took him to that facility. Are those officers defendants in this case? They are. They are. Why? What did they do wrong? Well, I think the constitutional standard in CON shows that officers at an absolute minimum, when they are aware of a heightened risk of suicide, must either hospitalize the detainee or they must report it to jail personnel. I think the record in the light most favorable to Mr. Kamakeeaina shows that Officer Potapoff brought him to Central Receiving Division, but the record does not reflect what was said. Officer Potapoff made a declaration where he merely said that he reported all facts and circumstances. He did not say who he told what and when about the risk of suicide. Did that facility, the city facility, have any medical facilities? The record does not reflect whether they had medical facilities or not. Isn't that why he was transferred to the CCC? Well, as I understand it, the Central Receiving Division is kind of where detainees are brought initially and then they're transferred if they're going to be held for trial. Isn't that why he was moved, your client was moved from the city jail, if you will, to the CCC? I don't think the record shows that he was transferred specifically for the purposes of any form of mental health treatment. And I think the record also shows that when he arrived at the Oahu Center, although he received an evaluation for mental health treatment, the record shows that he reported his past diagnoses and suicide attempts, but the two doctors that he was able to see, Drs. Leland and Yamamoto, both saw him briefly, dismissed and disregarded any serious medical need that he may have and declined to treat him in any way. So I think, again, here the facts are important and the inferences drawn from those disputed facts are important on summary judgment. And what we see the district court doing in the decision, in order to rule the way they did, particularly against the psychiatrist defendants, Drs. Leland and Yamamoto, those doctors, the district court had to draw certain conclusions. What exactly is the complaint? That they wouldn't give him Seroquel? The complaint is that they wouldn't give him Seroquel? The complaint is not that specific. Again, I think a prisoner does not have the right to say he wants a specific treatment. I think what the record does show— Well, that's why I was surprised to see it raised as an issue. Well, it's not the specific treatment. Here, I think what the record shows, again, in the light most favorable to Mr. Kamikianis, he received no treatment whatsoever. Drs. Leland and Yamamoto had several medications at their disposal. They also could have treated him with psychotherapy, counseling, even routine follow-ups, and yet they chose none of those treatment methods. So, again, this is not a case, like many of the case law, where it's differing medical opinions or the prisoner wants some stronger form of pain medication. This is a case where the prisoner is repeatedly asking for some form of mental health treatment and is being denied any form. And so, again, we think it's a different type of case here. I point your honors to, for example, the Coates v. Comura case. That's where the prisoner wanted a specific form of drug. He wanted Welbutrin, and the doctor instead treated with Seroquel and another medication. That's a case where a prisoner cannot raise a claim because, again, he's trying to say he wants specific treatment, and it's in discretion of the doctors. But here, what Mr. Kamikianis merely claimed is that he needed some form of treatment for these 352 days. But isn't withholding treatment and letting nature take its course a type of treatment, part of the Hippocratic oath of do no harm? Well, I think, Your Honor, if it's justified, if there truly is... And if it's justified, it's really a question of professional negligence, is it not? No, I think, Your Honor, in this case what you have is you have awareness of specific symptoms that Mr. Kamikianis is suffering. And, you know, the doctors can disagree about the diagnoses, but at the end of the day he is suffering from symptoms of bipolar disorder and PTSD. And I think one of the inferences that the district court failed to draw is that before, and especially immediately after his time at the Oahu Center, Mr. Kamikianis needed some form of treatment. Once Mr. Kamikianis was transferred from the Oahu Center, doctors were immediately prescribing him ultimately three different psychotropic medications, and he began receiving quarterly psychotherapy. And if this were a medical malpractice case, you might have a good claim, but this is deliberate indifference, correct? Absolutely. And so we can't show at a minimum that the doctors were aware of the condition and declined to treat it. What proof is there that they were subjectively aware that he was a danger to himself? Well, I think there's two things. Danger to himself is the risk of suicide, but I think also, you know, the case law makes clear that symptoms suffered from psychological problems alone are sufficient to be cognizable harm. I think there's definitely evidence of that type of harm. Was there another suicide attempt while he was in custody? There was not another suicide attempt while he was in custody. So if there was a risk of suicide, no harm caused, right? Well, I think there's a few things. First of all, if that's the risk and it didn't come to fruition, then there's no possible damage, right? Well, I think what the case law speaks to is that the risk needs to be substantial and significant, but the harm doesn't necessarily need to be significant. Judd v. Penner speaks to that, that the harm itself does not need to be substantial. It has to be something. It has to be something. And we believe that at least on summary judgment, Mr. Kamikiana's declaration makes clear. What was the harm? Anxiety, insomnia, other symptoms of his mental health illnesses. He made that clear that he was suffering from that. And, again, I think we can also look at the medical documentation after, once Mr. Kamikiana was transferred to the new facility, they again documented that he was cycling, still cycling, and he needed more specific medication for bipolar disorder. I think the record reflects that at the very least, you know, if he was experiencing these symptoms immediately after, the natural and logical inference is that before he was experiencing those same symptoms but was not able to be treated. I would also like to address awareness quickly, and then I'd like to reserve the remaining time for rebuttal. Drs. Littlen and Yamamoto make no declarations as to what they were or were not aware of. They have not even introduced facts into the record or said that they had not reviewed certain documentation or that they did not have access to certain parts of his record. So at the very least, on awareness, we have a disputed issue of facts, and Mr. Kamikiana has a right to take it to trial. And with that, if your honors have no further questions. Okay, thank you. We'll hear from the other side. Good morning. May it please the Court. Tracy Morita, Counsel for Epeliz, Ma'alo, Dobner, Willis, Rivera, and Potapoff. And I have five. For those of us who can't keep track of the names, who are these? These are, so Officers Ma'alo, Dobner, Willis, and Rivera are the officers that are on scene. Officer Potapoff is the. . . They're the HPD officers that responded to the scene. These are the officers, not the psychiatrists. Right, and the only reason that I was. . . I just want. . . Thank you. The only reason I was going to draw the distinction is that there's four officers who are on scene. There's a fifth officer, Officer Potapoff, who's the only officer that is placing Mr. Kamikiana under arrest. And then he's also the transporting officer who takes him to CRD. So for the purposes of, you know, this appeal, we would submit that there's no constitutional obligation by the first four officers from a 14th Amendment context because Mr. Kamikiana was never in their custody. So the Court can affirm summary judgment in this case on four independent bases. First, it's uncontested from the record that Officer Potapoff, who was the arresting and transporting officer, did inform personnel at the Central Receiving Division of the facts and circumstances of Mr. Kamikiana's arrest. And counsel for Mr. Kamikiana just represented that, you know, it wasn't that that's too vague and that the record doesn't say who he handed off to. But in fact, his own police report, as well as his declaration in support of the motion for summary judgment, stated that he apprised Lieutenant M. Frederick of the facts and circumstances and who accepted the arrest or accepted the custody of Mr. Kamikiana. Was this case in the news as it happened? I'm sorry. Was this case in the news as it happened? To my knowledge, no, it was not. Okay. Thank you. So just addressing that, there's no issue of fact at the record below. There's no issue of fact as to whether Officer Potapoff apprised CRD of the occurrences and what he witnessed. And that's all documented in his police report, as well. All five officers, in fact, in this case, contrary to some of the case law out there, such as in Cannes, where they didn't document, they didn't inform anyone, and that's the tenor of that case law, right, is that the officers observed, in fact, not just a suicide attempt, but a woman choking herself in a paddy wagon with a seat belt. And the court said that their only obligation was not to transport her to a medical facility, but that when a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety. That is exactly what Officer Potapoff did in his case, and that's where his constitutional obligations ended, because he then passed him off into the custody of CRD. And those officers at CRD, as well as the city and county of Honolulu, are not defendants in this case. You agree it would be different if an officer had a prisoner in custody who was bleeding, let's say? Absolutely. Then he'd have to, an obligation to transport him to a medical facility, right? Absolutely, and in this case. And you are drawing a distinction between a physical ailment that requires emergency care and a psychiatric ailment? Is that what it is? That is correct. Is that the line, or is it a line that the psychiatric problem were not such as to require emergency treatment? Yes and no. So, yes, I think there is a distinction. However, in the cases of an immediate, you know, psychiatric conditions, I'm not trying to discount, we're not trying to discount a psychiatric condition. It's if there was something, you know, warranting immediate treatment. And there are situations, like in Gibson, the Ninth Circuit case, where they said the inmate was so obviously ill because he was suffering from a manic depressive episode, and he was kicking and screaming in the car on the way to the facility. And, again, as in Kahn, the woman attempts to choke herself with a tea cup. So your argument hinders on the fact that his behavior was not such as to require emergency medical treatment, and therefore the officer was obligated to take him to the police station, basically, and have somebody else make the decision as to where he goes. That's your position? My position, our position is that the officers were not subjectively aware that there was any medical need in this case. I heard your learned friend say that the girlfriend advised the officers of the plaintiff's prior suicide attempts. Do you agree with that? That's undisputed. That's in the record that she, and the officers documented that, yes, she reported that there was this potentially some sort of suicide attempt. We're not disputing that. Well, doesn't that give the officers subjective knowledge of a risk? So what we would say is, viewing the actions of Mr. Kamakaena as a whole, the whole circumstance that he had just stabbed his girlfriend, that he had barricaded himself on a balcony, they're responding to a call of a domestic argument. They have no knowledge of Mr. Kamakaena's prior medical history, you know, dating back, which apparently dates back to 2004, or his childhood, or any of those circumstances. This is the first time they're coming upon him. And so they assess the situation as essentially a suspect that was attempting to barricade himself on a lanai and evade arrest. And that's documented in the record as well. At 147, 155, and 161, officers Ma'alo, Dobner, and Potapoff, who filled out separate use of force forms, because they came to this thinking that this was someone armed with a knife. And I'm seeing I'm running out of time, but if I could just answer this last question, just that he – You're not running out of your time. You're running out of your co-counsel's time. So essentially they viewed this as an attempt to evade arrest. He was yelling things like, I can't stand it. I stabbed her. And they documented his behavior as passive and direct resistance to being placed under arrest. I'm out of time. Thank you. Good morning. May it please the Court, my name is John Krager. I'm Deputy Attorney General for the State of Hawaii. I'm here representing Drs. Leland and Yamamoto in their individual capacity in this civil rights case. I'm here to convince you that Judge Seabright got it right. Judge Seabright, as one can see simply by reading his summary judgment order, did a very thorough examination of the record and was able to determine that the plaintiff had ample opportunities to complain of any mental health problems that were affecting him and did not. I want to also commend Pro Bono Counsel for their preparation of this case, but they seem to have confused the issue and applied a test that failure to provide active treatment modalities is ipso facto deliberate indifference. That is not the law. The one thing we do agree on, though, is that the applicable test is deliberate indifference. And I'd like to just briefly comment we're aware of the Kingsley, Borges, and Castro tests that are cases that change the test for pretrial detainees and remove the subjective component. But they can't remove the entire subjective component from deliberate indifference because it is inherently subjective. So what I understand we're looking at is proving it by objective evidence, which is what was done at the district court level in any event, regardless of the fact that this case was heard prior to the change in the test. I'm not sure because he's running out. What did the doctors do for Plaintiff? What did they do for him? They diagnosed him, and they determined that he had no active pathology that required treatment. And they stood available to treat him should that change. Dr. Leland, incidentally, I think it's in the record. Why was he detained in that facility for a year? His case simply didn't come to trial. That's the normal facility for holding pretrial detainees. He was just awaiting trial. He was just awaiting trial, Your Honor, yes, yes. Now, we seem to know that he did require some treatment because afterwards he did get treatment. Well, he had not received treatment, at least medical treatment, for five years prior to his incarceration. He had been seeing a therapist, which was in conjunction with Alcoholics Anonymous. Dr. Leland noted that he was aware of this treatment, but it was quite clear that he had not received any medication for five years before his incarceration. But let me just try, since my time is very limited. Both of the defendant's psychiatrists examined the plaintiff. Both arrived at a diagnosis that at the time he was not suffering from any active mental health pathology. Consistent with that diagnosis, they provided no active treatment modalities. That itself cannot be in deliberate indifference. Now, either or both of them could have been wrong. Had they been wrong, that would have been negligence, at most, medical malpractice. Theoretically, it's possible that they did believe that he had an active pathology and determined to conceal it. That might be deliberate indifference. Of course, there is no evidence to support that. But on the contrary, we have, and there were, well, we do have, the contemporaneous consultation reports of three other mental health professionals who actually unknown to the defendants examined the plaintiff for his fitness to stand trial. Similarly, each of them found no active pathology to treat. It's true that Dr. Blinder did note a history of pathologies, but he found no Axis I diagnosis specifically stated that. Axis I is the psychiatric type of diagnosis that requires treatment. Dr. Blinder did express dismay that the plaintiff was not receiving treatment, but he never told us what he needed treatment for. With the three independent doctors supporting my two clients, there's really no evidence of even medical negligence. Okay, thank you. You're over your time. I think you have a couple of minutes left. Thank you, Your Honor. Pardon me, can I ask you, what harm, if any, did your client receive at the hands of the officers, the arresting officers and the ones that saw him at the jail? I think what happened is that because he was taken to the central receiving division instead of either hospitalized or at the very least the record reflects that, you know, the symptoms were not sufficiently treated, it's difficult to tell what would have happened. No, no, no, pardon me. I'm not saying what treatment he should have received, what would have happened. My question is a factual one. What injury did your client receive at the two and a half days that he was at the jail? I think in his declaration he talks about suffering from chronic insomnia, anxiety, et cetera. Anxiety, insomnia, in other words, psychological symptoms. Okay. So I'd like to quickly just address some points that Mr. Kroger made. First, he talks about the difference between active treatment and passive treatment modalities. We're not arguing for a pro se rule here that, you know, every time someone asks for treatment they need to receive some sort of treatment. I think it's a disputed issue of fact at the very least as to whether Mr. Kamikiana needed treatment. And even if we're accepting at the least contention that they were- What about these three other doctors? Hmm? I think what the record reflects is that Mr. Kamikiana was so desperate for some form of treatment that he was challenging competency in his trial against the advice of his attorney. And the record reflects the only reason he did that is because he thought it was some reason to get some sort of treatment. Those doctors evaluated him for competency to stand trial. There was no sort of evaluation of whether he needed treatment. And as opposing counsel said- But they didn't find any pathologies, right? Again, they differed a little bit on pathologies in terms of PTSD or bipolar diagnosis. Some of them didn't necessarily rule out certain pathologies. But again, the only doctor that commented on treatment- And again, treatment is different from pathologies. The only doctor that commented on treatment expressed concern that Mr. Kamikiana was not receiving any form of treatment. And that doctor evaluated Mr. Kamikiana closest in time only 10 days after Mr. Kamikiana had seen Dr. Yamamoto. And just a quick point about the passive treatment modality point here. Even if we're accepting opposing counsel's contention that passive treatment was appropriate here, Dr. Yamamoto didn't even follow that. He canceled two attempted follow-ups. So was not even following just a passive follow-up and treat modality. With that, thank you, Your Honors. Okay. Thank you very much. Case is always hand-submitted. We thank Pro Bono Counsel for presenting the plaintiff.
judges: Kozinski, Hawkins, Bea